UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YUSEF LATEEF PHILLIPS,

    Plaintiff,        Hon. Hala Y. Jarbou

v.              Case No. 1:19-cv-331

ANDREW HINDS,

    Defendant.

_____/

## **REPORT AND RECOMMENDATION**

  Plaintiff Yusef Lateef Phillips brought this action against Defendant Andrew Hinds, pursuant to 42 U.S.C. § 1983, claiming that Defendant Hinds violated his Fourth Amendment rights by the use of deadly force in connection with his arrest on September 3, 2017.   The matter is before the Court on Defendant Hinds' Motion for Summary Judgment.   (ECF No. 106).   Plaintiff has responded (ECF No. 110) and Defendant replied (ECF No. 114).[1]   For the reasons articulated herein, and pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned judicial officer recommends that Defendant's motion for summary judgment be denied, as there are genuine issues of material fact concerning the reasonableness of Defendant's use of deadly force.[2]

---

[1] Although Defendant Hinds has requested oral argument, the undersigned finds that it is unnecessary, as the briefing has adequately developed the issues.

[2] Two related motions are also pending:   Defendant's Motion to Disregard and Strike all References to Ray Lee's Interview and Plaintiff's Exhibits 1 and 2 (ECF No. 111); and Plaintiff's Amended Motion to File Declaration of Ray Lee (ECF No. 118).   In light of the recommendation contained herein, both motions will be denied as moot in a separate order.

## Background

Yusef Phillips and his brother, Ray Lee, were part of a large-scale, multi-state drug trafficking organization involved in the distribution of heroin and cocaine. They were the organization's highest-ranking members in the Grand Rapids, Michigan, area.  (Hinds' Rpt., ECF No. 107-2, PageID.607).  In September 2017, Andrew Hinds was a Deputy with the Kent County Sheriff's Department (KCSD) and a member of KCSD's Tactical Apprehension and Confrontation Team (TAC Team). (Hinds' Dep., ECF No. 107-1, PageID.546; Thome Rpt., ECF No. 107-2, PageID.601).

For several weeks in August 2017, the Drug Enforcement Agency (DEA) had been surveilling Phillips and Lee through wiretaps on their cell phones and GPS tracking devices on their vehicles.  (Thome Rpt., ECF No. 107-2, PageID.601). During the investigation, DEA agents determined that Phillips and Lee had planned to meet a truck to obtain a large shipment of narcotics.  The truck was arriving in the Grand Rapids area from California in the early morning hours of September 3. Based on observations of prior narcotics shipments Phillips and Lee had received, it was believed that they would transport the drugs in separate vehicles to a Grand Rapids drug "stash house," an unoccupied apartment located at 3841 Whispering Way Drive, S.E. (*Id.*; *see also* Hinds' Rpt., ECF No. 107-2, PageID.607).

At 11:30 p.m. on September 2, 2017, the TAC Team assembled for a briefing in connection with assisting the DEA in executing multiple warrants in Kent County, including search and arrest warrants at 3841 Whispering Way.  The team members were informed of Phillips and Lee's apparent plan to obtain a large quantity of

2

narcotics from a truck in the early morning of September 3, 2017.   The TAC Team members were also informed that the two men were the highest-ranking members of the trafficking operation in the Kent County area, that both had extensive criminal histories, including convictions for "drug delivery, weapons offenses, and felony assault." (Hinds' Rpt., ECF No. 107-2, PageID.607).   The team members were told that Phillips and Lee had been known to carry firearms and, due to the amount of money and drugs involved, they would likely be armed.   (*Id.*).

The plan called for the TAC Team members to divide into three teams and to arrest Phillips and Lee when they exited the Whispering Way apartment building after dropping off the drugs.   Team 1 was to stage on the north side of the building and assist with apprehending Phillips and Lee.   Team 2 was to stage along the south side of the building after the suspects entered the building.   That team was to make contact and arrest the two suspects after they had exited the building.   The plan was to effect the arrest far enough away from the entrance that the suspects could not re-enter and barricade themselves inside the building, but not far enough away that they could get into their vehicles.   Team 3 was to arrive in the parking lot in a marked police vehicle.   Hinds was assigned to Team 2.   (Hinds' Dep., ECF No. 107-1, PageID.555; Thome Rpt., ECF No. 107-2, PageID.601–02; Hinds' Rpt., ECF No. 107-2, PageID.607).

Following the briefing, the TAC Team went to a staging point where they waited for nearly two hours as they received updates on the suspects' locations. When informed that Phillips and Lee were in the Whispering Way apartment,

Team 2 moved into position at the southeast corner of the building.   Once in position, Hinds looked north toward the main door through which the suspects were expected to exit the building.   At approximately 4:00 a.m., Phillips and Lee left the apartment building.   Phillips was wearing a white tank top and gray sweatpants, and Lee was wearing a blue hooded sweatshirt.   The two walked ten to fifteen feet in an easterly direction down the sidewalk.   (Hinds' Rpt., ECF No. 107-2, PageID.608).

Hinds was wearing a helmet and a tactical uniform bearing the word "Sheriff." He was armed with a Glock .22 caliber handgun and an AR-15 Bushmaster rifle.   He was the first officer in the "stack" (group) on Team 2, and he would be the first member to confront the suspects.   Hinds approached Phillips and Lee from behind. The area was dimly lit.   (Hinds' Dep., ECF No. 107-1, PageID.549; Hinds' Rpt., ECF No. 107-2, PageID.608).

### A.      Defendant Hind's Version of the Shooting Incident

Defendant Hinds' testimony regarding the shooting incident is as follows.   As Hinds approached Phillips and Lee, and while he was some ten to fifteen yards away from them, he loudly gave a single command: "police, get on the ground."   (Hinds' Dep., ECF No. 107-1, PageID.551-52, 555-56).   Hinds gave no other commands, and he did not hear any other officer give a similar command.[3]   (*Id.* at PageID.555-56).

---

[3] Defendant's brief cites the testimony of other deputies to the effect that Phillips was given multiple commands to get on the ground and to not move.   (Def's Br. at 8, ECF No. 107, PageID.520).   But the issue here concerns the reasonableness of Hinds' actions, which must be assessed by his personal awareness of the tactical situation at the time he pulled the trigger.   *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (The assessment regarding the reasonableness of the use of deadly force must be made from the perspective of a reasonable officer in the defendant's position.).

4

Hinds testified that, upon giving the command to "get on the ground," Phillips "crouched, made a quick movement towards his waistband and came in an upward movement towards [Hinds'] team, which led [Hinds] to believe that [Phillips] was armed." (*Id.* at PageID.548). Phillips was using his right hand and arm in making the upward movement. (*Id.* at PageID.557). Hinds does not recall seeing anything in Phillips' hand. (*Id.*). Hinds fired one shot from his AR-15 rifle into Phillips' chest. (*Id.* at PageID.551, 557, 560).

### B. Plaintiff Phillip's Version of the Shooting Incident

Plaintiff Yusef Phillips' testimony regarding the shooting incident is as follows. On September 3, 2017, Phillips and his brother, Ray Lee, arrived at the Whispering Way apartment shortly before 4:00 a.m. and placed the drugs from the truck – some ten kilograms of cocaine – in a toolbox in the apartment. (Phillips' Dep., ECF No. 110-3, PageID.1100, 1111-12). Approximately fifteen minutes later, the two walked out of the apartment complex together, each intending to leave in separate vehicles. (*Id.* at PageID.1111, 1113). Phillips was wearing a white tank top, gray sweatpants, and a pair of black Air Max Nike shoes. (*Id.* at PageID.1114). He had two cell phones and a set of car keys with him; he does not recall having anything in his hands, but he is not certain. (*Id.* at PageID.1114-19, 1122, 1124). It is possible that he also had his driver's license on his person. (*Id.* at PageID.1115).

As they were walking out of the apartment building, Phillips and Lee were speaking to each other. (*Id.* at PageID. 1127-28). Phillips heard "some commotion" coming from his right and behind him, and he stopped to look to see what it was. (*Id.* at PageID.1128). He does not recall hearing any actual words being spoken by any

5

of the law-enforcement officers, including the command to "get on the ground."  (*Id.* at PageID.1129, 1187).   Phillips could not discern the source of the commotion, but it made him immediately stop and look to see what it was.  (*Id.* at PageID.1128, 1130).   He does not recall his brother saying anything during the commotion.  (*Id.* at PageID.1129).   Phillips also does not recall whether he saw anyone as he left the apartment building before his encounter with the Sheriff's deputies.  (*Id.* at PageID.1114).

As soon as Phillips stopped and looked to see what was causing the commotion, he found himself "on the ground in pain."  (*Id.* at PageID.1128-29).   Sometime later, he realized that he had been shot.  (*Id.* at PageID.1133).

Phillips testified that he is "certain" his hands were at his side at the time he was shot.  (*Id.* at PageID.1130-31).   He had not done anything with his hands in the moments immediately before being shot, including reaching for his waistband with his right hand.  (*Id.* at PageID.1130, 1187).   Phillips is left handed, and had he been holding his cell phone it would likely have been in that hand.  (*Id.* at PageID.1132).

## C.   The Video Evidence

Each party cites to the video of the shooting incident in support of his respective version of the shooting incident.   The video is designated in the record as Exhibit G to Defendant Hinds' motion for summary judgment.   Defendant has provided the Court with a DVD containing the video, which includes what has been labeled "synchronized views."   Defendant offers no explanation as to how this video was made, who made it, or the accuracy of the date/time indicator.   But Plaintiff appears to accept the accuracy of what is depicted in the video.  (*See* Pltf's Br. at 5,

ECF No. 110, PageID.1010).    Accordingly, the Court has considered the video evidence, despite the lack of foundation.

The undersigned has reviewed the video many times – too many to count.    The quality of the video, along with the angle of view, make it impossible to determine precisely what happened with respect to the facts critical to the pending dispositive motion.    Even Defendant's forensic video analyst notes the poor quality of the video and the resulting difficulties in ascertaining precisely what is depicted.    (*See* ECF No. 107-12, PageID.956).    The analyst also correctly notes that it is impossible to know with certainty whether anything was in Phillips' hands and whether Phillips reached from his waistline, as Hinds' contends, as much of the view of Phillips is obstructed by a parked car.    (*Id.* at PageID.957, 958-59).

In the undersigned's view, the video cannot support a dispositive determination regarding the reasonableness of Defendant Hinds' actions one way or the other.    At the very least, the video is not the type of unambiguous evidence that can be used to resolve the conflicting accounts of the parties in this case.    *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The video shows Phillips and Lee leaving the apartment building on September 3, 2017, at 3:59:47 a.m.   The two descend some steps to a sidewalk that runs along the parking lot and perpendicular to the building.   Lee is walking ahead of Phillips.   As the two reach the ground level, a vehicle blocks the view of both of them from a little above the waist to the ground.   The dimness of the ambient light makes it difficult to discern at which point Phillips turns his head to the right, in the apparent direction of Hinds, but at least by 3:59:56, his head is turned in that direction.[4]   In the next second, at 3:59:57, Phillips' head and chest are lower on the screen.   It is unclear whether he is bending down, "crouching," or has just stepped off the curb.[5]   The vehicle blocking the view prevents the Court from discerning with any clarity what Phillips is doing with his body at this point.   At the same time (3:59:57), there is a flash of light directed toward Phillips, and he instantaneously goes down, apparently shot by Hinds.

## **Legal Standards**

### A.    **Summary Judgment**

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   Whether a fact is "material" depends on

---

[4] At about the same time, there is a blip of sorts in the video.   It is not clear what causes this blip.   Apparently, this is the image distortion noted in the forensic video analyst's report, which the analyst attributes to "motion blur."   (ECF No. 107-2, PageID.957).   The analyst does not identify the cause of the motion blur.

[5] The forensic video analyst describes this as "crouching."   (ECF No. 107-12, PageID.957-58).   This description begs the question.

"whether its resolution might affect the outcome of the case." *Harden v. Hillman*, 933 F.3d 465, 474 (6th Cir. 2021).

A party moving for summary judgment can satisfy its burden by demonstrating that the non-moving party, "having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party makes this showing, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). The existence of a mere "scintilla of evidence" in support of the non-moving party's position, however, is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005).

While the Court must view the evidence in the light most favorable to the non-moving party, that party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006). Likewise, the non-moving party cannot merely "recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353-54 (6th Cir. 2004).

Accordingly, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.   Stated differently, the "ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Harden*, 2021 WL 1257802 at *4.

### B.    Qualified Immunity

The doctrine of qualified immunity recognizes that government officials must be able to carry out their duties without fear of litigation.   *See Davis v. Scherer*, 468 U.S. 183, 195 (1984).   They can do so only if they reasonably can anticipate when their conduct may give rise to liability for damages.   *Ibid.*   When government officials perform discretionary functions, they are shielded from liability for civil damages unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *District of Columbia v. Wesby*, __ U.S. __, 138 S.Ct. 577, 589 (2018); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) (same); *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (same).   The order in which the two prongs are addressed is left to the sound discretion of the Court.   *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A legal principle is clearly established if it has "a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S.Ct. at 589. "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. In other words, the contours of the rule in question "must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Ibid.* (quoting *Saucier*, 533 U.S. at 202). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.' " *Ibid.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## <u>Analysis</u>

Defendant Hinds argues that he is entitled to summary judgment because the undisputed material facts establish that his use of deadly force was objectively reasonable under the circumstances, or at least that his conduct did not violate clearly established law. In other words, he essentially contends that he did not violate Plaintiff's Fourth Amendment rights, but even if he had, he is entitled to qualified immunity.

Defendant Hinds has offered a great deal of evidence supporting his contention that his use of deadly force was reasonable, including the testimony of other officers at the scene. But summary judgment is not decided on the basis of the weight of the evidence proffered by the moving party, but rather, whether there are genuine disputes of material fact requiring a jury trial. *See, e.g., Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 686-87 (6th Cir. 2006). In addition, it should be noted

11

that Defendant Hinds' credibility is not at issue at this juncture.   This Court may not consider the credibility of witnesses in reviewing a motion for summary judgment. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).   It is the jury, not this Court, whose responsibility it is to weigh the evidence and to assess credibility.

The Supreme Court's instructions in this regard are quite clear.   In assessing the pending summary judgment motion, the Court must view all the evidence, and draw all reasonable inferences, in the light most favorable to Phillips.   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.   Whether There is a Dispute of Material Fact Regarding the Reasonableness of the Use of Deadly Force.

If the undisputed facts establish that Defendant Hinds use of deadly force was objectively reasonable, there is no constitutional violation, and the Court need not address the issue of qualified immunity.   If Plaintiff raised a dispute of material fact concerning that issue, however, the Court must continue to the second prong of the qualified immunity analysis.

The Fourth Amendment explicitly prohibits the unreasonable seizure of a person.   "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).   To be sure, "[t]he intrusiveness of a seizure by deadly force is unmatched."   *Id.* at 9.

12

The reasonableness inquiry in an excessive force case is an objective one:  "the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  *Id.*  This objectively reasonable standard must be applied in light of the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."  *Id.* at 396-97  Thus, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.

The assessment of reasonableness must look to the officer's actions "during the shooting itself and the few moments immediately preceding it."  *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)); *see also Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) ("We measure the reasonableness of the use of deadly force at a particular time based on an 'objective assessment of the danger a suspect poses *at that moment*.' " (quoting *Bouggess*, 482 F.3d at 889) (emphasis in *Mullins*)).  The assessment "requires asking whether 'the officer has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or to others."  *Bouggess*, 482 F.3d at 889 (quoting *Garner*, 471 U.S. at 11); *see Garner*, 471 U.S. at 11-12.  The

13

threat factor is "a minimum requirement for the use of deadly force." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).

In applying the probable cause standard, the Supreme Court has identified a non-exhaustive list of factors to consider: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. "These factors help inform [the Court's] ultimate inquiry, which must always be 'whether the totality of the circumstances' justified the use of force." *Mullins*, 805 F.3d at 765 (quoting *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007)). The focus must remain on whether Defendant Hinds had an "objectively reasonable belief" that Phillips "posed an imminent threat of serious physical harm to him or to others." *Bouggess*, 482 F.3d at 890. "If [Hinds] did not have such a belief, then his use of deadly force violated the Fourth Amendment." *Ibid.*

Assuming, for purposes of this motion, that Plaintiff's version of the shooting incident is true and accurate – as this Court must do – a reasonable jury could find that Defendant's use of deadly force violated Plaintiff's Fourth Amendment rights.

Defendant's brief expends a great deal of ink on the issue of the "severity" of the criminal activity in which Plaintiff was engaged, and the seriousness of his prior felony convictions. To be sure, Plaintiff was a leader of a very large drug trafficking conspiracy, he was known to have firearms, and his criminal history included some violent felony convictions. This information, which had been provided to Defendant

14

during the pre-raid briefing, certainly warranted caution in approaching Plaintiff. The concepts that drug dealers are potentially dangerous, and armed drug dealers more so, are neither novel nor controversial. That does not justify the use of deadly force, however, absent specific actions by Plaintiff that support an objectively reasonable conclusion that he posed an imminent threat of serious bodily harm at the time Defendant pulled the trigger. That conclusion must be based on "a particularized and supported sense of serious danger" concerning the confrontation at issue, rather than a generalized notion that Plaintiff was a dangerous person. *See Bouggess*, 482 F.3d at 891. Neither the Supreme Court nor the Sixth Circuit has ever accepted such a sweeping generalization as a lawful justification for the use of deadly force. *Id.* (citing *Garner*, 471 U.S. at 11-12; *Dickerson*, 101 F.3d at 1162).

Defendant's description of Plaintiff's response to his command to get to the ground certainly paints a picture of an individual who is non-compliant.[6] The Court agrees with Defendant that a failure to respond to a police officer's command – whether or not the arrestee has actually heard or understood the command – is relevant to the inquiry into the reasonableness of an officer's conduct. But non-compliance, and even resistance to arrest, does not alone warrant the use of deadly force. *See, e.g., Garner*, 471 U.S. at 9-12. Moreover, the fact that the situation

---

[6] Defendant's contention that Plaintiff "actively resisted arrest" (Def's Br. at 19, ECF No. 107, PageID.531) appears somewhat tenuous, given what can be gleaned from the video evidence. More to the point, Plaintiff's testimony directly contradicts this contention.

unfolded very quickly does not necessarily justify the use of deadly force.    *See Mullins*, 805 F.3d at 765; *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005).

The crux of this case comes down to what, if anything, did Plaintiff do to support an objectively reasonable conclusion that he posed an imminent threat of physical harm.    Here is where Plaintiff's testimony, which is corroborated in part by Defendants' testimony, creates a genuine dispute of material fact precluding summary judgment.    It is uncontroverted that Plaintiff was unarmed at the time he was shot.    Plaintiff testified that he was walking out of the apartment complex with his arms to his side.    He denies making the "furtive movement" described by Defendant.    Plaintiff says he turned in the direction of the "commotion" (Defendant's TAC Team) and was shot.    The video corroborates that the shooting took place almost instantaneous to Plaintiff's movement.    Defendant acknowledges that he does not recall seeing anything in Plaintiff's hands.    On these facts, a reasonable jury could conclude that Defendant lacked an objectively reasonable basis to conclude that Plaintiff posed an imminent threat of bodily harm.

**B.    Whether Plaintiff's Allegations Regarding Defendant's Use of Deadly Force, and Given All Reasonable Inferences, Was Clearly Proscribed by Judicial Precedent.**

Having found that there is a genuine issue of material fact as to whether Defendant Hinds' use of deadly force was objectively reasonable, the Court must now turn to whether that use of force – as alleged by Plaintiff and giving his assertions the benefit of all reasonable inferences – was proscribed by clearly established judicial precedent.    As the Supreme Court has observed:    "[T]his Court's case law does not

require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, —–U.S.—–, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Both the Supreme Court and the Sixth Circuit have long recognized that the right to be free of deadly force, absent probable cause that the individual poses an imminent threat of serious bodily harm, has been clearly established.  *See Garner*, 471 U.S. at 11; *Bouggess*, 482 F.3d at 896 (citing *Garner*, 471 U.S. at 11-12); *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005); *Dickerson*, 101 F.3d at 1162.   Within the context of a qualified immunity analysis, the Sixth Circuit has more recently noted that "it is axiomatic that individuals have a clearly established right not to be shot absent 'probable cause to believe that [they] pose[] a threat of serious physical harm, either to the officer or to others'."  *Mullins*, 805 F.3d at 765 (quoting *Sample*, 409 F.3d at 698, which in turn quotes *Garner*, 471 U.S. at 11); *see also Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) ("[W]ith regard to deadly force, we explained in *Garner* that it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.' " (quoting *Garner*, 471 U.S. at 11)).

Moreover, the Supreme Court has recognized that there are obvious cases in which a law enforcement officer would be on notice that certain conduct violates the constitution, based on the Court's more generalized rulings regarding constitutional standards, despite an absence of a previous case with materially similar facts.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).   The Sixth Circuit has held that "some cases

can be so obvious under *Garner* and governing circuit precedent that officers should be presumed to have been aware that their conduct violated constitutional standards." *Bouggess*, 482 F.3d at 895 (citing *Sample*, 409 F.3d at 699; *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005)).    The instant case is such an obvious case. *Cf. Bouggess*, 482 F.3d at 895;

The Sixth Circuit's decision in *Dickerson v. McClellan* is instructive.    101 F.3d 1151 (6th Cir. 1996).    In that case, there was uncontroverted evidence that Dickerson was in his residence in possession of a firearm he recently fired nine times, that the responding officers smelled freshly burnt gunpowder, and that the officers heard the suspect using threatening language.    *Id.* at 1154.    McClellan testified that Dickerson pointed a handgun at him, at which point McClellan shot and killed him.    *Id.* at 1155.    Another officer's testimony corroborated McClennan's account. *Ibid.*    One of Dickerson's neighbors testified that Dickenson was walking slowly towards the front door of his house with his arms to his side, and before he opened his front storm door and while still in the house, she heard a gunshot.    In the "next instant," she was struck in the mouth by a bullet.    *Id.* at 1154-55.    The after-acquired evidence indicated that Dickerson had not fired his gun at the officers, and that Dickerson had been home alone arguing with his girlfriend on the telephone. *Id.* at 1155.    The District Court denied McClellan's claim for qualified immunity regarding the use of deadly force because it found material issues of fact regarding the sequence of events leading to the shooting, and the Sixth Circuit agreed.    *Id.* at 1163-64; *see also Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) (denying

qualified immunity to officer who fired fatal shots, as there was an issue of fact as to whether the suspect had pointed his gun at the other officers just before the shooting); *Sigley v. Kuhn*, 205 F.3d 1341, 2000 WL 145187, at \*15 (6th Cir. 2000) (denying qualified immunity to the shooting officer where a factual dispute existed as to whether the suspect was attempting to obtain the officer's firearm during a struggle); *Bouggess*, 482 F.3d at 895 (citing *Craighead*, 399 F.3d at 958-63 (affirming the denial of qualified immunity when an officer shot an individual holding a gun, after responding to a report of a shot having been fired, when there was disputed testimony as to whether the suspect pointed the gun at the officer)).[7]

Simply put, it was clearly established, as of September 3, 2017, that it violated the Fourth Amendment for a police officer to employ deadly force against an individual, absent probable cause that the individual posed a threat of serious physical harm to the officers or others.   Because, as discussed above, a reasonable juror could find such probable cause lacking, Defendant Hinds is not entitled to qualified immunity.

---

[7] In *Craighead*, the Eighth Circuit noted that neither party had cited a case with facts "substantially similar" to the case at hand, and that the Court had failed to find one. 399 F.3d at 962.   Nevertheless, and relying on *Hope v. Pelzer*, 536 U.S. 730 (2002), the Court held that the *Garner* decision was sufficient to put officers on notice "that they may not use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others."   *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005).

## **Conclusion**

It is evident from a review of the record evidence that there is a genuine dispute of material fact as to whether Defendant had an objectively reasonable basis for concluding that Plaintiff posed an imminent threat of serious bodily injury.  This dispute of material fact also precludes a finding of qualified immunity at this time. "[W]hen 'the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury,' the 'jury becomes the final arbiter of [a] claim of immunity.' " *Bouggess*, 482 F.3d at 888 (quoting *Brandenburg*, 882 F.2d at 215-16).

Accordingly, and for the foregoing reasons, I recommend that the Court deny Defendant's motion for summary judgment (ECF No. 106).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,


Date: August 11, 2021                         /s/ Phillip J. Green
                                              PHILLIP J. GREEN
                                              United States Magistrate Judge